HARNISCHFEGER CORPORATION, Plaintiff-Respondent,

v.

LABOR & INDUSTRY REVIEW COMMISSION, Defendant-Co-Appellant,†

Guenther GIESKE, Defendant-Appellant.†
[Case No. 93–0947.]

HARNISCHFEGER CORPORATION, Plaintiff-Respondent,

v.

LABOR & INDUSTRY REVIEW COMMISSION, Defendant-Co-Appellant,†

Edward BOHN, Defendant-Appellant.†
[Case No. 93–0948.]

HARNISCHFEGER CORPORATION, Plaintiff-Respondent,

v.

LABOR & INDUSTRY REVIEW COMMISSION, Defendant-Co-Appellant,†

Emmerich DRAWITSCH, Defendant-Appellant.†
[Case No. 93–0949.]

†Petitions to review granted.
†Petitions to review granted.
†Petitions to review granted.
†Petitions to review granted.
†Petitions to review granted.
†Petitions to review granted.

Court of Appeals

*Nos. 93–0947, 93–0948, 93–0949. Oral argument March 31, 1994.—Decided April 26, 1994.*

(Also reported in 517 N.W.2d 193.)

On behalf of the defendants-appellants, Guenther Gieske, Edward Bohn, and Emmerich Drawitsch, the cause was submitted on the briefs of *David Weir* of *Zubrensky, Padden, Katzman and Weir*, of Milwaukee. There was oral argument by *David L. Weir*.

On behalf of the defendant-co-appellant, the cause was submitted on the briefs of *James E. Doyle*, attorney general, and *Richard Briles Moriarty*, assistant attorney general. There was oral argument by *Richard B. Moriarty*.

On behalf of the plaintiff-respondent, the cause was submitted on the briefs of *Thomas M. Rohe* of *Otjen, Van Ert, Stangle, Lieb & Weir, S.C.*, of Milwaukee. There was oral argument by *Thomas M. Rohe*.

Amicus Curiae brief was filed by *Michael H. Gillick* of *Murphy, Gillick, Wicht & Prachthauser*, of Milwaukee, for the Wisconsin Academy of Trial Lawyers.

Before Wedemeyer, P.J., Sullivan and Fine, JJ.

FINE, J. This is a consolidated appeal from the trial court's vacatur of orders entered by the Labor and Industry Review Commission in three worker's compensation claims, and its remand to the Commission for further proceedings.

The issue here is whether an employer is liable for all of an employee's compensable hearing loss even though only part of that loss was caused by the employer. The Commission's position is that under § 102.555(8), STATS., the employer is liable for all of an employee's compensable hearing loss, including any pre-employment hearing loss as long as that pre-employment hearing loss was below the compensable threshold, but that the employer is not liable for the pre-employment hearing loss if that loss equaled or exceeded the compensable threshold. Harnischfeger, on the other hand, contends that the employer is only liable if the hearing loss caused by the employment exceeds thirty decibels. The trial court held that the Commission violated § 102.555(8), STATS. Although we reject Harnischfeger's interpretation, we affirm the trial court's orders.[1]

## I.

The three cases before us, to which the Commission applied its interpretation of § 102.555(8), STATS.,

---

[1] An *amicus* brief in support of the appellants was submitted by the Wisconsin Academy of Trial Lawyers.

are those of Guenther Gieske, Edward Bohn, and Emmerich Drawitsch. Gieske worked for Harnischfeger from 1967 through June 3, 1989. The parties agree that he suffered compensable hearing loss during this employment. In awarding hearing-loss compensation to Gieske, the Commission did not give to Harnischfeger credit for Gieske's pre-employment hearing loss because that loss did not, by itself, rise to a compensable level. As explained in the decision by the Administrative Law Judge, adopted by the Commission, the Department of Industry, Labor and Human Relations' "policy has been not to allow a credit unless a pre-existing hearing loss rises to the compensable level."

Bohn worked for Harnischfeger from 1965 through September 5, 1989. The Commission similarly did not credit Harnischfeger for Bohn's pre-employment hearing loss because that loss did not, by itself, rise to a compensable level. Drawitsch worked for Harnischfeger from 1965 through February 2, 1990. As in *Gieske* and *Bohn*, the Commission did not grant to Harnischfeger credit for Drawitsch's pre-employment hearing loss because that loss did not, by itself, rise to a compensable level.

## II.

As material here, § 102.555(8), STATS., provides that "[a]n employer is liable for the entire occupational deafness to which his or her employment has contributed; but if previous deafness is established by a hearing test or other competent evidence . . . the employer is not liable for previous loss so established."[2]
" 'Occupational deafness' means permanent partial or

---

[2] Section 102.555(8), STATS., provides in full:

231

permanent total loss of hearing of one or both ears due to prolonged exposure to noise in employment." Section 102.555(1), STATS.

Under rules not challenged here, the Department of Industry Labor and Human Relations bases measurement of hearing loss on "the average of the 4 speech frequencies," and has determined that "[a]udiometric measurement for these 4 frequencies averaging 30 decibels or less on the ANSI calibration does not constitute any practical hearing impairment." WIS. ADM. CODE § IND. 80.25(4). Accordingly, hearing loss must exceed 30 decibels to be compensable. WIS. ADM. CODE § IND. 80.25(8).

■

Judicial review of the Commission's orders is limited. Section 102.23, STATS. In the context of this case, the Commission's orders may not be set aside unless the Commission "acted without or in excess of its powers." Section 102.23(1)(e)1, STATS. The trial court determined that the Commission's orders violated § 102.555(8), STATS. Although our review is *de novo, see Stafford Trucking, Inc. v. ILHR Dept.*, 102 Wis. 2d 256, 260, 306 N.W.2d 79, 82 (Ct. App. 1981), we agree.

■

"Absent a constitutional infirmity, courts must apply statutes as they are written, unless to do so would lead to an absurd result that did not reflect the legislature's intent." *State v. Young*, 180 Wis. 2d 700, 704, 511 N.W.2d 309, 311 (Ct. App. 1993), *review*

---

An employer is liable for the entire occupational deafness to which his or her employment has contributed; but if previous deafness is established by a hearing test or other competent evidence, whether or not the employe [*sic* ] was exposed to noise within the 2 months preceding such test, the employer is not liable for previous loss so established nor is the employer liable for any loss for which compensation has previously been paid or awarded.

*granted*, February 22, 1994. Policy considerations in worker's compensation matters are for the legislature and not the courts. *State v. Labor and Industry Review Commission*, 136 Wis. 2d 281, 297, 401 N.W.2d 585, 592 (1987). Although courts rightfully give deference to the interpretation of statutes by administrative agencies charged with their enforcement, this deference is not given when "the agency's interpretation directly contravenes the words of the statute." *Lisney v. Labor & Industry Review Commission*, 171 Wis. 2d 499, 505-506, 493 N.W.2d 14, 16 (1992); *see also Gorzalski v. Frankenmuth Mut. Ins. Co.*, 145 Wis. 2d 794, 801, 429 N.W.2d 537, 539-540 (Ct. App. 1988).[3]

Section 102.555(8), STATS., is clear: "An employer is liable for the entire occupational deafness to which his or her employment has contributed." The Commission's interpretation of § 102.555(8) makes the employer liable for all of an employee's deafness—not just "*occupational* deafness to which his or her employment has contributed." (Emphasis added.) It thus cannot stand.

The contention that the employer should be liable for pre-employment deafness below the compensable threshold focusses on the following language in § 102.555(8), STATS.: "but if previous deafness is established by a hearing test or other competent evidence . . . the employer is not liable for previous loss so established." This, the appellants argue, must mean *compensable* "deafness" or hearing "loss" under WIS. ADM. CODE § IND. 80.25 because loss under thirty deci-

---

[3] Indeed, "[a]n administrative rule, even of long duration, may not stand at variance with an unambiguous statute," *Basic Products Corp. v. Department of Taxation*, 19 Wis. 2d 183, 186, 120 N.W.2d 161, 162 (1963), because "[n]o agency may promulgate a rule which conflicts with state law," § 227.10(2), STATS.

bels "does not constitute any practical hearing impairment." *See* WIS. ADM. CODE § IND. 80.25(4). Thus, they assert that a pre-employment hearing loss must exceed the 30-decibel level before the employer may get credit for that loss. The statute, however, is not so limited.

Hearing loss is progressive; a person reaches the compensable threshold of thirty-one decibels only if he or she has already suffered thirty decibels of loss. Under the Commission's interpretation of § 102.555(8), STATS., adopted by the Dissent, if employee A started work with a hearing loss of thirty decibels, and suffered an additional hearing loss of one decibel during his employment, the employer would be liable for the entire thirty-one decibel hearing loss, even though the employment only contributed just over three percent to the employee's total hearing loss. This interpretation disregards the physiological damage evidenced by decibel loss below the compensable threshold of thirty-one decibels. The statute says that an employer is not liable for the hearing loss that antedates the employment. Nevertheless, both the Commission and the Dissent would make the employer liable for this pre-employment loss.[4] Section 102.555(8), STATS., however, is to the contrary; we may not rewrite the statute.

 Implementation of § 102.555(8), STATS., and WIS. ADM. CODE § IND. 80.25 requires a three-stage analysis. First, does the employee's hearing loss equal or exceed the compensable threshold of thirty-one decibels? If so, the second question is whether the employee has suffered an "occupational deafness," as defined by

---

[4] Thus, the table on page 244 of the Dissent has employer B liable for the entire forty decibel loss, even though that employment only caused twenty decibels of that loss.

§ 102.555(1), STATS. If so, the third question is whether the employee's "occupational deafness" was caused by the employment at issue. If the answer to each question is "yes," the employer is liable for the "occupational deafness" caused by the employment. The employer, however, is not liable for any pre-employment hearing loss. Rather, the employer is only liable for the percentage of hearing loss caused by the employment. Thus, if employee **B** started work with a five-decibel hearing loss, and suffered an additional thirty-five decibel "occupational deafness" loss for a total loss of forty decibels, the employer would be liable for 87.5% of the forty-decibel loss (thirty-five divided by forty).[5] By the same token, if employee **C** started work with a thirty-five decibel hearing loss, and suffered an additional thirty-five decibel loss for a total loss of seventy decibels, the employer would be liable for 50% of the seventy-decibel loss. Similarly, in the example involving employee **A**, the employer would be liable for 3.23% of the thirty-one decibel loss (one divided by thirty-one).[6]

---

[5] These calculations assume that hearing loss is linear; if it is not, the calculations may have to be changed but the analysis remains the same. Under § 102.555(8), STATS., the employer is only liable for the percentage of hearing loss caused by the employment.

[6] In their brief on this appeal, appellants posit the following hypothetical:

> Employee Smith begins work as a paper machine operator at a plant in Rhinelander, Wisconsin, and is subjected to noise causing hearing loss. He works at the same plant location, on the same machine, for the same supervisors producing the same product, for thirty years. At the start of his employment, he has "perfect" hearing, zero db results on testing. After ten years, he has 20 db of loss, and the plant is sold from ABC Corporation to DEF Corporation. While the ownership changes, the job remains the same for Smith, working day-in and day-out at his paper machine. After 20 years of

We affirm the trial court's orders. Further proceedings before the Commission are to be in conformity with this decision.

*By the Court.*—Orders affirmed.

SULLIVAN, J. (*dissenting*). I would reverse the order of the circuit court and affirm the finding of the Commission.

As explained by the majority, the statute in question, § 102.555(8), STATS., provides that "[a]n employer is liable for the entire occupational deafness to which his or her employment has contributed; but if previous deafness is established by a hearing test or other competent evidence . . . the employer is not liable for previous loss so established." Occupational deafness is defined as "permanent partial or permanent total loss of hearing of one or both ears due to prolonged exposure to noise in employment." The statute, however, neither defines "loss of hearing," nor does it provide a means for the measurement of loss of hearing.

work, the plant again is sold, this time to XYZ Corporation, and Smith's testing now reflects a 40 db loss. He continues employment for 10 more years, retiring with honor after a total of 30 years of service operating the same paper making machine. He now has a 60 db loss, cannot hear the telephone ring, and turns up the TV volume to such high levels that he irritates his family, and he must finally admit to his impairment and purchase a hearing aid.

Assuming without deciding the validity of the assumption concerning the legal import of the change-of-ownership scenario, under § 102.555(8), STATS., DEF Corporation would be liable for its contribution to Smith's "occupational deafness," that is, fifty percent (twenty divided by forty), and XYZ Corporation would be liable for its contribution to Smith's "occupational deafness," that is, thirty-three and one-third percent (twenty divided by sixty).

The Department has gauged hearing impairment on a scale of 0% to 100%, in accordance with the "Hearing Impairment Table," as found in WIS. ADM. CODE § IND. 80.25(8):

### HEARING IMPAIRMENT TABLE

| Average Decibel Loss ANSI | Percent of Compensable Hearing Impairment | Average Decibel Loss ANSI | Percent of Compensable Hearing Impairment |
|---|---|---|---|
| 30 | 0.0 | 62 | 51.2 |
| 31 | 1.6 | 63 | 52.8 |
| 32 | 3.2 | 64 | 54.4 |
| 33 | 4.8 | 65 | 56.0 |
| 34 | 6.4 | 66 | 57.6 |
| 35 | 8.0 | 67 | 59.2 |
| 36 | 9.6 | 68 | 60.8 |
| 37 | 11.2 | 69 | 62.4 |
| 38 | 12.8 | 70 | 64.0 |
| 39 | 14.4 | 71 | 65.6 |
| 40 | 16.0 | 72 | 67.2 |
| 41 | 17.6 | 73 | 68.8 |
| 42 | 19.2 | 74 | 70.4 |
| 43 | 20.8 | 75 | 72.0 |
| 44 | 22.4 | 76 | 73.6 |
| 45 | 24.0 | 77 | 75.2 |
| 46 | 25.6 | 78 | 76.8 |
| 47 | 27.2 | 79 | 78.4 |
| 48 | 28.8 | 80 | 80.0 |
| 49 | 30.4 | 81 | 81.6 |
| 50 | 32.0 | 82 | 83.2 |
| 51 | 33.6 | 83 | 84.8 |
| 52 | 35.2 | 84 | 86.4 |
| 53 | 36.8 | 85 | 88.0 |
| 54 | 38.4 | 86 | 89.6 |
| 55 | 40.0 | 87 | 91.2 |
| 56 | 41.6 | 88 | 92.8 |
| 57 | 43.2 | 89 | 94.4 |
| 58 | 44.8 | 90 | 96.0 |
| 59 | 46.4 | 91 | 97.6 |
| 60 | 48.0 | 92 | 99.2 |
| 61 | 49.6 | 93 | 100.0 |

The Department has labeled a decibel deficit[1] of 30 "on the ANSI calibration" as a 0% impairment. An employee does not have a compensable disability until the employee reaches a 31-decibel deficit. On the other end of the scale, the Department has labeled a 93-decibel deficit as a 100% impairment. Thus, under the Department's calculations, decibel deficits of less than 30 or more than 93 are of no relevance when calculating the percentage of hearing impairment. *See* WIS. ADM. CODE § IND. 80.25(9)(c) ("95 db = 100% loss").

The Department has concluded that a deficit of less than 30 decibels on the ANSI calibration "does not constitute any practical hearing impairment." WIS. ADM. CODE § IND. 80.25(4). Simply put, the Department does not adopt the blanket proposition that loss of decibels is the same as loss of hearing. The Department does, however, accept the proposition that, between the decibels of 31 and 93, there is a direct correlation between loss of decibels and loss of hearing.

A very simplistic definition of decibel, as it relates to hearing impairment, can be found in an ordinary dictionary:

> a unit for measuring the relative loudness of sounds equal approximately to the smallest degree of difference of loudness ordinarily detectable by the human ear the range of which includes about 130 decibels on a scale beginning with 1 for the faintest audible sound.

---

[1] Though the word "deficit" is not used in the statute or the administrative code, this writer finds it useful to differentiate between the act of losing decibels, and the state of existence once decibels have been lost. That is to say, assume a person experiences a 30-decibel "loss" today, that person begins tomorrow with a 30-decibel "deficit."

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 585 (1976). The administrative code contains a formula for calculating the percentage of hearing impairment using decibels as units of measure. This formula requires the computation of the average decibel loss over "the 4 speech frequencies of 500, 1,000, 2,000, and 3,000 Hz." WIS. ADM. CODE § IND. 80.25(9)(c).

That there is more than one method for assessing decibel loss is illustrated by a comparison of the current code with the 1956 administrative code. *See* WIS. ADM. CODE § IND. 80.25 (1956). That code adopted the report of the medical subcommittee on workmen's compensation legislation, which concluded that decibel losses would be tested only in *three* frequency ranges. The medical subcommittee reported:

> [L]osses of hearing ability for high frequency tones (4000 and above) could be observed in many audiograms. However, it was unanimously agreed by the members of the committee that such high frequency losses do not constitute any disability for hearing ordinary conversational voice, and it was felt that hearing loss as used in this discussion should be confined to losses occurring in the frequencies ordinarily used for speech conversation.

Thus, the subcommittee recommended that although testing would be conducted using frequency ranges between 250 and 8,000 cycles per second, only decibel losses for 500, 1,000 and 2,000 cycles per second would be used in the computation of decibel loss. The medical subcommittee also reported that losses averaging 16 decibels or less in the frequencies between 500 and 2000 cycles per second do not constitute any practical hearing disability. Thus, the 1956 code set a compensa-

ble hearing loss range from approximately 17 decibels to 80 decibels.

In light of the complex calculations that necessarily go into assessing hearing loss under WIS. ADM. CODE § IND. 80.25, the majority puts unwarranted emphasis on the numerical value assigned to the "decibel loss" on the "ANSI calibration" calculated over the four *selected* frequency ranges. It is clear that the "average decibel loss" at which one ultimately arrives after performing the calculations is by no means a *precise* measure of, and is not the equivalent of, actual hearing loss as that phrase is used in everyday language among laypersons. Before one even arrives at the average decibel loss, one must recognize that the Department has already factored out numerous *actual* losses of hearing, i.e., the higher and lower frequency range losses that the Department has concluded do not really "matter."

That is not to say, however, that merely because the number is not precise, it should be automatically accepted. Rather, it is the fact that "loss of hearing" is difficult, at best, to quantify, that leads this writer to conclude that a substantial amount of deference is required when reviewing the Department's conclusion as to where "loss of hearing" begins. To say, at this point, that this court knows better than the Department as to whether the first thirty decibels *should* count as a "loss of hearing" would be imprudent. This court does not have the necessary expertise to assess the importance of a given decibel loss, much less a particular decibel loss within a particular frequency range. More importantly, that is not the issue on appeal, nor was it the issue in previous proceedings in this case. Thus, this writer would defer to the expertise of the Department. Within the selected frequency

ranges, the Department has set a deficit of 30 decibels as a 0% impairment. The statute allows the Department to define "loss of hearing" and the Department has painstakingly done so.

The bottom line, in this writer's opinion, is that the Department does not consider a 30-decibel impairment, or less, to be "occupational deafness" as that term is used in the § 102.555(1), STATS. Thus, under the Department's Hearing Impairment Table, a person with a 30-decibel deficit is considered to have 0% occupational deafness, a person with a 31-decibel deficit has 1.6% occupational deafness, and a person with a 32-decibel deficit has 3.2% occupational deafness. The percentages increase at a rate of 1.6% per decibel, up to a maximum of a 93-decibel deficit, at which point the employee reaches 100% occupational deafness. Under this scheme, an employer responsible for causing an employee to go from a 30-decibel deficit, to a 32-decibel deficit, is responsible only for the increase in "occupational deafness" from 0% to 3.2%. The majority would look at this same situation and say that the employer is being held liable for 100% of the occupational deafness.

To use a different example, consider the majority's example of Employee C, who started work with a 35-decibel deficit and suffered an additional 35-decibel loss while working for Employer Y. This writer, using the Department's Hearing Impairment Table, would conclude that Employer Y is liable for the increase in occupational deafness that occurs between 35 decibels and 70 decibels—that is, the increase from 8% occupational deafness and 64% occupational deafness. Thus, Employer Y would have caused 56% of total possible occupational deafness. Total occupational deafness involving both ears is compensable by an award of 216 weeks of compensation. Section 102.555(4), STATS.

Thus, Employer Y would be responsible for 56% of 216 weeks, which equals 120.96 weeks.

In contrast, the majority looks at the example of Employee C and states: "the employer would be liable for 50% of the seventy-decibel loss." The question then arises, 50% of what? This writer assumes that the majority's calculation would involve 50% of the total award for a 70-decibel loss. According to the Hearing Impairment Table, a 70-decibel loss is compensated at 64% of total hearing impairment. Sixty-four percent of 216 weeks equals 138.24 weeks of compensation. That means, if the entire 70-decibel loss were attributable to one employer, the employee's award would have been 138.24 weeks of compensation. Under the majority's analysis, however, Employer Y is responsible for only 50% of this total loss, or 69.12 weeks.

Consider for a moment the calculations if Employee X had caused Employee C's pre-existing 35-decibel deficit. Assuming Employee C had begun working for Employer X with a 0-decibel deficit, Employee C could have collected a compensation award from Employer X based upon the 35-decibel loss. Such an award, according to the Hearing Impairment Table, would be compensable by an award equal to 8% of "cost" of total hearing impairment—that is, 8% of 216 weeks, which equals 17.28 weeks of compensation. The majority would hold Employer X responsible for 100% of the 17.28-week award because Employer X caused the entire 35-decibel deficit. On this point, the majority and this writer arrive at the same answer.[2]

---

[2] This writer would arrive at the award by calculating 8% of 216 weeks, which equals 17.28 weeks of compensation. That would end the calculation, however, and there would be no need to multiply that award by the additional figure of 100%.

The difference in calculations becomes apparent, however, when we total the employee's awards from Employers X and Y. Under the dissent's calculations, the employee would receive a total award of 138.24 weeks of compensation—17.28 weeks from Employer X and 120.96 weeks from employer Y. Under the majority's calculations, the employee would receive a total of 86.4 weeks of compensation—17.28 weeks from Employer X and 69.12 weeks from Employer Y. As calculated above, if the entire 70 loss had been attributable to one employer, the employees award would be 138.24 weeks of compensation. That is the same as the total collected from Employers X and Y under the dissent's calculations. Under the majority's approach, however, the employee who changed jobs is penalized. This difference in awards demonstrates a fundamental flaw in the majority's calculations.

The same problem arises upon calculation of the award discussed in footnote 5 of the majority opinion. For this calculation, it is helpful to speak in terms of dollars rather than weeks. If one assumes that the employee earns approximately $500 per week, the award for total deafness in two ears would be $500 x 216 weeks, or $108,000. For the purposes of these calculations, round this total award to an even $100,000. To reiterate the facts of footnote 5, the employee moved from Job A to Job B and finally to Job C. The employee began Job A with a 0-decibel deficit, and incurred a 20-decibel loss at each job. To add a further illustration, this writer has added Job D, where the employee begins with a 60-decibel deficit and suffers an additional 20-decibel loss, bringing the total decibel deficit

to 80 at the completion of the job. Consider the following calculations.

| Job | Deficit at Beginning and End of Job | Majority's Percentage | Award From Table | Majority's Award (Columns 3 × 4) | Dissent's Calculation (% change in occupational deafness × total award for complete deafness) |
|---|---|---|---|---|---|
| A | 0–20 | | 20 db = 0% 0% × $100,000 = $0 | $0 | 0% × $100,000 = $0 |
| B | 20–40 | 50% (20/40) | 40 db = 16% 16% × $100,000 = $16,000 | $8,000 | 16% – 0% = 16% 16% × $100,000 = $16,000 |
| C | 40–60 | 33.33% (20/60) | 60 db = 48% 48% × $100,000 = $48,000 | $16,000 | 48% –16% = 32% 32% × $100,000 = $32,000 |
| D | 60–80 | 25% (20/80) | 80 db = 80% 80% × $100,000 = $80,000 | $20,000 | 80% –48% = 32% 32% × $100,000 = $32,000 |
| | | | Total Award | $44,000 | $80,000 |

The problems presented by the majority's calculations are again apparent from this example. If the employee had suffered the total 80-decibel loss at one job, the employee's total award would be $80,000—that is, 80 decibels is compensable by 80% of total impairment, and 80% of $100,000 is $80,000. Under this writer's calculations, the employee's total award from all employers would also be $80,000. Under the majority's method of calculation, however, the employee would receive a total of $44,000.

Under the dissent's calculations, Employers C and D are each assessed $32,000. Consistent with the Department's scheme, Employers C and D each caused a total decibel loss of 20, and a corresponding hearing loss of 32%. The award from Employer B, on the other

244

hand, is $16,000. Employer B caused a decibel loss of 20, but a corresponding 16% loss of hearing. Likewise, Employer A caused a decibel loss of 20, but a corresponding 0% loss of hearing.

The calculations in this dissent are not set forth to show that any result caused by the majority's analysis is inequitable. Thus, this writer disclaims any intention to merely reach a desired result. On the contrary, this writer begins with the hypothesis that the Department has properly defined the range within which one experiences a "loss of hearing" and "occupational deafness." The calculations then demonstrate that the Department has properly applied that definition throughout, even to the point that it incorporated the 30-decibel baseline into its compensation table.

Even if this writer were to agree with the majority, that, in essence, hearing loss begins with decibel 1, he still cannot agree with the manner in which the majority proposes to calculate the compensation award. Section 102.555(4), STATS., provides:

> [T]here shall be payable for . . . total occupational deafness of both ears, 216 weeks of compensation; and for partial occupational deafness, compensation shall bear *such relation to that named in this section as disabilities bear to the maximum disabilities* provided in this section.

(Emphasis added.) The Department currently measures hearing in increments of 1 decibel, and the definition of decibels cited in this dissent indicates that the maximum number of decibels that a human can lose is 130. Thus, under § 102.555(4), any given decibel loss caused by an employer must be measured as a percentage of the *maximum disability*, 130 decibels,

245

not as a percentage of the actual decibel loss or deficit from which the employee currently suffers.

To demonstrate the majority's mathematical error, we once again consider the majority's example of Employee C, who began employment with a 35-decibel deficit, and ended with a 70-decibel deficit. Under the majority's straight decibel method, the hearing loss percentage attributable to the employer should be calculated as follows. The employer has caused 35 decibels of loss out of a **maximum of 130** possible decibels—approximately 27%. Twenty-seven percent of the maximum award of 216 weeks (again assuming impairment to both ears) is 58.32 weeks of compensation. How the Department's 30 non-compensable decibel method would apply to this formula is unknown; the current system simply does not provide for this type of calculation.

I respectfully dissent.